IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STEVEN CRUMP,

    **Plaintiff,**

v.                                        CASE NO. 24-3063-JWL

(FNU) (LUN) (1), Chief, Olathe
Police Department, et al.,

    **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. At the time of filing, Plaintiff was in custody at the Johnson County Adult Detention Center in New Century, Kansas. Plaintiff is not currently in custody. The Court granted Plaintiff leave to proceed in forma pauperis. This matter was stayed pending the resolution of Plaintiff's state criminal proceedings. The stay was lifted, and the Court screened Plaintiff's Amended Complaint at Doc. 15. On February 27, 2025, the Court entered a Memorandum and Order (Doc. 25) ("M&O") granting Plaintiff an opportunity to file a second amended complaint to cure the deficiencies noted in the M&O.

**I. Nature of the Matter before the Court**

Plaintiff filed a Second Amended Complaint (Doc. 27) ("SAC"), and on May 5, 2025, the Court entered a Memorandum and Order (Doc. 28) ("M&O II") ordering Plaintiff to show good cause why several claims in his SAC should not be dismissed for the reasons set forth in the M&O II. The Court also dismissed Plaintiff's claims against the Olathe Police Department ("OPD").

Plaintiff filed a response to the M&O II. (Doc. 29.) After reviewing the response, the Court entered a Memorandum and Order (Doc. 31) ("M&O III") finding that Plaintiff failed to

1

show good cause and dismissing the following claims for failure to state a claim: Plaintiff's Fourteenth Amendment claim based on excessive force; Plaintiff's Fourteenth Amendment claim based on reprehensible conduct; Plaintiff's claim for abuse of discretion; Plaintiff's claim under 15 U.S.C. § 1117(a); Plaintiff's Fourteenth Amendment equal rights claim; and Plaintiff's claim under 42 U.S.C. § 1981. The Court also found in the M&O III that "Plaintiff's response sets forth multiple counts that were not included in his SAC." (Doc. 31, at 6.)

The Court also found in the M&O II that the proper processing of Plaintiff's remaining claims could not be achieved without additional information from appropriate OPD officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). Accordingly, the Court ordered the appropriate OPD officials to prepare and file a *Martinez* Report on these claims. The Court stated that "[t]he Report should focus on Plaintiff's Fourth Amendment claims, failure to train claim, and ADA claim." (Doc. 28, at 18.) The *Martinez* Report (Docs. 34, 61, and 62) (the "Report") was filed, and on October 17, 2025, the Court entered a Memorandum and Order (Doc. 73) ("M&O IV") granting Plaintiff an opportunity to respond to the Report and to show good cause why his excessive force claims against Officers Lazzaro, Guthrie,[1] and Wray should not be dismissed for failure to state a claim. This matter is before the Court on Plaintiff's response (Doc. 75).

**II. Plaintiff's SAC**

Plaintiff alleges that on July 4, 2023, he was not a fugitive when he was walking down the street suffering from physical and mental distress. (Doc. 27, at 2, 14.) Plaintiff acknowledges that he was holding a rock, but argues that he was not using it in a threatening manner. *Id*. at 5. Plaintiff alleges that he was trying to wave down a vehicle for help. *Id*. at 14.

---

[1] Plaintiff refers to Officer Guthrie as Officer Gunthrie.

Plaintiff alleges that OPD officers arrived and tried to kill him by running him over, and by shooting him in the spine with a less lethal round, permanently crippling him without warning. *Id.* Plaintiff alleges that Officer Guthrie tried to run over Plaintiff with his vehicle. *Id.* at 7–8. Plaintiff alleges that Officer Clausius[2] arrived on the scene with his K-9 and instructed Guthrie to bean bag Plaintiff, and then Guthrie told Officer Wray to shoot Plaintiff. *Id.* at 16. Plaintiff alleges that Officer Wray shot Plaintiff in the spine with a less-lethal round (bean bag) without giving Plaintiff any warning or instructions. *Id.* at 8. Plaintiff alleges that he posed no threat and was 100 feet from Officers Guthrie and Wray when he was shot in the back. *Id.* at 5. Plaintiff also alleges that Officer Clausius tased him without warning and commanded his K-9 to bite Plaintiff five times while Plaintiff was restrained on the ground by Officer Lazzaro. *Id.* at 10. Plaintiff alleges that the dog chewed off half of Plaintiff's calf. *Id.*

Plaintiff alleges that Officer Lazzaro body-slammed Plaintiff while Plaintiff had his hands up, and then restrained Plaintiff while adjusting his body in order to hold out Plaintiff's leg so that the K-9 could bite Plaintiff five times. *Id.* at 12, 17. Plaintiff alleges that "an officer" took Plaintiff's severely injured left leg and "ground it into the hot pavement" and while doing this "put his weight down upon [Plaintiff's] ankle with his knee and by slamming, grinding his weight on the ankle bone tore off the tendon and ligaments which has made [Plaintiff's] left leg, left foot unusable." *Id.* at 17. Plaintiff alleges that the officers did not identify themselves, did not use lights or sirens, and did not give warnings. *Id.* at 6, 14.

Plaintiff alleges that the OPD and the Chief of Police Mike Butaud failed to oversee and train its officers on how to interact with persons known to suffer from a psychiatric disability. *Id.* at 1. Plaintiff alleges that the Police Department killed a person in *Arnold v. City of Olathe*, when

---

[2] Plaintiff refers to Officer Clausius as Officer Clavsius.

Butaud was Deputy Chief, and failed to correct the deficiencies in the OPD.[3] *Id*. at 2. Plaintiff alleges that officers were not properly trained on the use of force, crisis management, and de-escalation. *Id*. at 3. Plaintiff alleges that OPD officers were found liable for excessive force on these same claims in *Varnas v. Thompson*.[4] *Id*. Plaintiff alleges that OPD officers have a pattern of using excessive force during welfare checks. *Id*.

Plaintiff alleges that Officer Guthrie made false allegations in the police report that resulted in Plaintiff's false arrest, malicious prosecution, and false imprisonment. *Id*. at 4. Plaintiff alleges that Officer Guthrie made false claims that Plaintiff tried to attack Guthrie with the rock. *Id*. at 15. Plaintiff alleges that Sgt. Wyrick is a supervisor that failed to train officers, and that he signed a sworn affidavit "of a crime [Plaintiff] did not commit" in order to cover up police brutality and misconduct. *Id*. at 6. Plaintiff also alleges that Sgt. Wyrick was in communication with the responding officers and gave them permission to use deadly force against Plaintiff. *Id*.

As Count I, Plaintiff alleges excessive force in violation of the Fourth Amendment based on his encounter with OPD officers. *Id*. at 37. As Count II, Plaintiff alleges excessive force in violation of the Fourteenth Amendment based on the same encounter. *Id*. As Count III, Plaintiff alleges a Fourth Amendment illegal seizure claim, alleging that officers illegally stopped him, failed to identify themselves, failed to inform Plaintiff that he was under arrest, and never clearly articulated a reasonable suspicion of a crime. *Id*. at 38. Plaintiff has also alleged false imprisonment and malicious prosecution.

---

[3] *See Arnold v. City of Olathe, Kansas*, 35 F.4th 778, 785 (10th Cir. 2022) (affirming District Court's dismissal finding that officers did not violate constitutional rights and stating that "officers did not recklessly create the need to use deadly force [and] when the officers did use force, it was reasonably necessary to prevent harm to themselves and others").

[4] *See Varnas v. Thompson*, 2024 WL 4625536 (D. Kan. 2024).

### III. Discussion

#### A. Excessive Force

"Excessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth Amendment, depending on where in the criminal justice system the plaintiff is at the time of the challenged use of force." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (citation omitted). "When an 'excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

"To state an excessive force claim under the Fourth Amendment, plaintiffs must show *both* that a seizure occurred and that the seizure was unreasonable." *Id.* (quoting *Bond v. City of Tahlequah*, 981 F.3d 808, 815 (10th Cir. 2020) (emphasis in original) (quotation marks omitted)). In assessing reasonableness, a court "looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Id*. (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020)). The inquiry is an objective one, and one that considers the totality of the circumstances. *Id*. (citation omitted). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (quoting *Graham*, 490 U.S. at 396). "The right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . . to effect it." *Edwards v. City of Muskogee, Oklahoma*, 841 F. App'x 79, 83 (10th Cir. 2021) (unpublished) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (internal quotation marks omitted)). "Reasonableness does not require that officers use alternative or less intrusive means if the conduct is otherwise reasonable." *Arnold v. City of Olathe, Kansas*, Case No. 2:18-cv-02703-HLT, 2021 WL 3129408, at *8 (D. Kan. July 23, 2021) (citation omitted).

The Supreme Court in *Graham* outlined three factors that guide the reasonableness analysis: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Vette*, 989 F.3d at 1169 (quoting *Graham*, 490 U.S. at 396). Regarding the first factor, "in an excessive force inquiry, we ask whether the force used would have been reasonably necessary *if the arrest or the detention were warranted*." *Luethue v. Kyle*, 131 F.4th 1179, 1197 (10th Cir. 2025) (citation omitted).

The second *Graham* factor is "undoubtedly the most important." *Id*. (citation omitted). Courts evaluating this factor "must look at whether the [deputies or others] were in danger at the precise moment that they used force." *Id*. (citation omitted). Courts "look[ ] at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Id*. (citation omitted). "Where a suspect is 'unarmed' and 'outnumbered,' this factor tilts in the plaintiff's favor." *Id*.

In evaluating the third factor, a court considers "whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use of force." *Vette*, 989 F.3d at 1169 (citation omitted). The Tenth Circuit has also held that "initial resistance does not justify the continuation of force once the resistance ceases." *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (citations omitted). If a suspect is armed, courts consider the non-exclusive so-called *Larsen* factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Varnas*, 2024 WL 4625536, at *5 (citing *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)); *see also Marta v. City of Las Cruces*,

2024 WL 2396602, at n. 15 (D. N.M. 2024) (noting that the *Larsen* factors only apply to armed suspects).

The Court's M&O IV granted Plaintiff an opportunity to respond to the Report and to show good cause why his excessive force claims against Officers Lazzaro, Guthrie, and Wray should not be dismissed for failure to state a claim. Plaintiff has filed his response (Doc. 75). In his response, Plaintiff asserts that he was not suspected of a crime, not under arrest, and not a wanted fugitive at the time of the encounter with OPD officers. (Doc. 75, at 3.) Plaintiff alleges that he was shot with the bean bag in the back while he was walking away. *Id*. The videos support this allegation, and show that Plaintiff was at a distance from officers when the bean bags were shot toward him. *See* Doc. 61–1, at Exhibit E–4. The interactions between the officers suggest that they were aiming for Plaintiff's leg, and the first two rounds missed Plaintiff.[5] *Id*.

Plaintiff also continues to assert in his response that officers failed to disclose that he had been shot with the bean bag in the back. (Doc. 75, at 1.)[6] He claims that officers called an ambulance but failed to disclose that Plaintiff had been shot in the back. *Id*. The videos show that officers photographed his back while the paramedics were present, and at the hospital Officer Lazzaro informed medical staff that Plaintiff was shot in the center of his back with a bean bag. *See* Doc. 61–1, at Exhibit E–1. Officer Lazzaro then goes over to Plaintiff's bed and assists the medical staff by raising Plaintiff's upper body off the bed so that they can assess his back. *Id*. Officer Lazzaro then states that he believes that is the only shot that made contact, but advises them that they should look to make sure no other bean bags made contact. *Id*. They then look at

---

[5] This same video shows the officer discussing the bean bag shots with a supervisor and when asked by the supervisor if there was an assault, the officer responds "no" and indicates they were not close enough.

[6] Plaintiff also filed an Affidavit of Statement Regarding Spinal Injury and Police Brutality by Officer Adam Wray (Doc. 72), stating that regarding the bean bag shot to his back "no disclosure of the injury was made to hospital personnel by law enforcement." (Doc. 72, at 1.)

Plaintiff's elbow.  *Id*.

"The mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation." *Vargas*, 2024 WL 4625536, at *4 (citation omitted).  Plaintiff alleges that officers were responding to a 911 call for a welfare check, not based on an alleged crime. *See* Doc. 27, at 14.  At the scene when paramedics were assessing Plaintiff, an officer can be heard indicating that they had dealt with Plaintiff a couple of times earlier that day, and what started out as a mental health issue, they now believed to be "JA" related. (Doc. 61–1, at Exhibit E–4.)  A video of Plaintiff at the jail the next day shows Plaintiff apologizing and stating that he was hallucinating and thought the officers were coming to kill him. (Doc. 61–1, at Exhibit E–10.)

Although several of Plaintiff's allegations are inconsistent with the videos submitted with the Report,[7] the Court finds that Plaintiff's excessive force claims are sufficient to survive the Court's screening.

### B. Illegal Seizure/False Imprisonment/Malicious Prosecution

Plaintiff acknowledged that his claims were related to his state criminal proceedings in Johnson County, Kansas, where he was charged with aggravated assault on a law enforcement officer. *See State v. Crump*, Case No. 23CR02273 (District Court of Johnson County, Kansas) (filed July 5, 2023).[8]  Plaintiff alleges that the false criminal charges were based on falsified information. (Doc. 27, at 6.)  Plaintiff claims that Officer Guthrie made false allegations in the

---

[7]  Plaintiff alleged that Officer Guthrie tried to run over Plaintiff with his patrol car, and that an officer took Plaintiff's severely injured leg and "ground it into the hot pavement" and while doing this "put his weight down upon [Plaintiff's] ankle with his knee and by slamming, grinding his weight on the ankle bone tore off the tendon and ligaments which has made [Plaintiff's] left leg, left foot unusable." (Doc. 27, at 14, 17.)  The Court's M&O IV sets forth why these allegations are inconsistent with the videos, photographs, and findings in Case No. 24-3036-EFM. (Doc. 73, at 2–6.)
[8]  It appears that the docket for this case is no longer available on the Kansas District Court Public Access Portal and that the case may have been expunged. *See* https://prodportal.kscourts.gov/prodportal.

police report that resulted in Plaintiff's false arrest, malicious prosecution, and false imprisonment. *Id*. at 4.  Plaintiff claims that Officer Guthrie made false claims that Plaintiff tried to attack Guthrie with the rock. *Id*. at 15.  Plaintiff alleges that Sgt. Wyrick is a supervisor that failed to train officers, and that he signed a sworn affidavit "of a crime [Plaintiff] did not commit" in order to cover up police brutality and misconduct. *Id*. at 6.  Plaintiff alleges that the false statements were used to initiate criminal charges and to justify Plaintiff's detention. (Doc. 75, at 7.)  Plaintiff alleges that he was detained in isolation for eighteen months. *Id*. at 2.  Plaintiff's criminal case was dismissed.

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *Luethue*, 131 F.4th at 1193 (citation omitted).  "Probable cause exists if 'the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.' " *Id*. (citations omitted).  "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause.' " *Id*. (citations omitted).

"Even if an officer 'subjectively intended to base the arrest on an offense for which probable cause is lacking,' no Fourth Amendment violation occurs as 'long as the circumstances, viewed objectively, justify the arrest.' " *Horocofsky v. City of Lawrence*, 2022 WL 1421554, at *23 (D. Kan. May 5, 2022) (citing *McKnight v. City of Topeka*, 2020 WL 5747917, at *19 (D. Kan. 2020) (quoting *Quinn v. Young*, 780 F.3d 998, 1006 (10th Cir. 2015)).  "[I]t is a Fourth Amendment violation to 'knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause.' " *Id*. (citing *Taylor*, 82 F.3d at 1562 (quoting *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996)).

Additionally, "an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Luethue*, 131 F.4th at 1193 (citation omitted). "When an officer claims probable cause to arrest under a state law, we look to the text of the state statute—as well as decisions from that state's highest court interpreting the statute, if needed—to determine whether the officer had probable cause to arrest under the specific elements of the state statute." *Id*. (citations omitted). There is no probable cause where "an officer lacks an objectively reasonable basis to believe a suspect has committed an offense[,]" and probable cause cannot be based on an unreasonable mistake of fact. *Id*. "Instead, officers are 'require[d]' 'to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention.' " *Id*. (citation omitted). "And officers 'are charged with knowledge of any readily available exculpatory evidence that they unreasonably fail to ascertain.' " *Id*. (citation omitted).

"To determine whether a claim is for malicious prosecution or false imprisonment, the Tenth Circuit looks to whether the alleged detention occurred before or after the institution of legal process." *McIntyre v. Unified Gov't of Wyandotte Cty. and Kansas City, Kansas*, 2020 WL 1028303, at *7 (D. Kan. March 3, 2020) (citing *Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013), *as amended on denial of reh'g* (Jan. 8, 2014)). "If plaintiff's detention occurred before he received legal process, he can assert a claim for false imprisonment." *Id*. (citing *see Wallace v. Kato*, 549 U.S. 384, 389 (2007) (false imprisonment claim where defendants did not have warrant for plaintiff's arrest)). A "plaintiff has a viable false imprisonment claim if he alleges that his detention occurred *without legal process*." *Id*. (citing *Wallace,* 549 U.S. at 389). "By contrast, if plaintiff's alleged detention occurred *with legal process*, he can assert a claim for malicious

prosecution." *Id*. (citing *Wilkins v. DeReyes*, 528 F.3d 790, 795 (10th Cir. 2008) (malicious prosecution claim where defendants arrested plaintiff with arrest warrant obtained with fabricated evidence and coercive interrogation techniques)).

The Court finds that Plaintiff's Fourth Amendment claims based on his detention, arrest, and prosecution survive screening.

### C. ADA

Plaintiff also alleges an ADA claim. The ADA prohibits discrimination by government entities on the basis of disability. Plaintiff claims he has suffered from psychiatric disabilities since 2004. *See id.* at 19. In his SAC he claims that he "had become lost, disoriented and was suffering from physical injury and severe dehydration causing grand delusions." *Id*.at 14. He also claims that he was "suffering a near death experience, extreme fear, panic and anxiety." *Id*. at 15.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To state a claim under Title II of the ADA, a plaintiff must allege: (1) he is 'a qualified individual with a disability'; (2) he 'was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity'; and (3) 'such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.'" Crane, 15 F.4th at 1312 (quoting *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016)). The inability to prove any one of these elements precludes an ADA claim. *Id*. "Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *J.V.*, 813 F.3d at 1295.

11

Plaintiff suggests that he was denied public services when he was allegedly attacked by officers and that Defendants failed to accommodate his psychiatric disabilities. *See* Doc. 27, at 29, 31.  Plaintiff alleges that his claim is similar to the claim asserted in *Funke v. Hatten*, 2021 WL 2346003 (D. Nev. 2021).  In *Allen v. Hays*, the plaintiff cited cases from the Ninth Circuit "that support a general right of action under the ADA for '(i) discrimination based on disparate treatment or impact, or (ii) denial of reasonable modifications or accommodations.' " *Allen v. Hays*, 65 F.4th 736, 752 (5th Cir. 2023).  The Fifth Circuit affirmed the dismissal of the ADA claims, finding that "[e]ven if plaintiffs were correct that other circuits would allow a claim against police officers—a proposition that is far from clear—the law in this circuit is unequivocal: The ADA 'does not apply to an officer's on-the-street responses to . . . incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Id*. (citing *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000)).

This Court found that a similar ADA claim failed as a matter of law in *Sudac v. Hoang*, finding that:

> As a starting point, the court is guided by the Tenth Circuit's decision in *Gohier v. Enright.* [186 F.3d 1216 (10th Cir. 1999)].  In *Gohier,* the Tenth Circuit confronted the issue of "whether a person with a disability can state a claim under the ADA based on police conduct in an arrest or investigation." *Id.* at 1220.  The court discussed two potentially viable theories recognized by other federal courts: the wrongful-arrest theory; and the reasonable-accommodation-during-arrest theory. *Id.* at 1221. The wrongful-arrest scenario occurs when a law enforcement officer arrests an individual after incorrectly perceiving the effects of an individual's disability as illegal conduct. *Id.* at 1220–21 (citation omitted).  In contrast, the reasonable-accommodation-during-arrest theory is based on a proper investigation or arrest of a person "with a disability for a crime unrelated to that disability." *Id.* The contention is that the law enforcement officer "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* (citations omitted).

12

Under the facts of *Gohier,* the defendant, Officer Enright, responded to a dispatcher's request to investigate a report that a man, later identified as Lucero, had been damaging vehicles with a foreign object. *Id.* at 1217. When Enright reached the vicinity of the alleged incidents, he saw Lucero walking down the middle of the street. *Id.* He pulled over his patrol car and turned on his highbeams and emergency lights. *Id.* After he exited his car, Enright asked Lucero to talk to him, but Lucero continued to walk down the street. *Id.* at 1218. When Enright ordered Lucero to stop, Lucero turned around, put his right hand behind his back, and began quickly walking toward Enright with a " 'crazed and wild-eyed' " expression. *Id.* Enright drew his gun and twice ordered Lucero to show his hands. *Id.* Lucero continued to advance, raised his right hand, and began swinging an object in his right hand with a stabbing motion. *Id.* Enright retreated behind his car and ordered Lucero to drop the object. *Id.* Lucero advanced to the driver's side of the patrol car and began to open the door. *Id.* At that point, Enright moved to stop Lucero. *Id.* In response, Lucero stepped or lunged toward Enright and made a stabbing motion with the object. *Id.* Enright shot Lucero two times, killing him. *Id.*

One of the issues presented to the Tenth Circuit was whether the plaintiff, the representative of Lucero's estate, could amend her complaint to add a claim under Title II of the ADA. *Id.* at 1217. Specifically, the plaintiff alleged that the defendant city failed to protect Lucero in light of his disability, paranoid schizophrenia. *Id.* The Tenth Circuit determined that the wrongful-arrest theory did not apply because Enright did not misperceive any lawful conduct caused by Lucero's disability as criminal activity and then arrest Lucero for that conduct. *Id.* at 1221. Rather, the court observed that Lucero's activity was unlawful and that Enright used force not to effect an arrest, but in self-defense. *Id.* As to the reasonable-accommodation-during-arrest theory, the court commented that the plaintiff might have alleged that Title II of the ADA required the defendant city "to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability." *Id.* But because the plaintiff "affirmatively disclaimed reliance" on the reasonable-accommodation-during-arrest theory, the court declined to express an opinion as to the theory's application to the facts of the case. *Id.* As a result, the Tenth Circuit expressly stated that it remained "an open question in this circuit whether to adopt either or both [theories]." *Id.* at 1221. The Tenth Circuit, however, did clarify "that a broad rule categorically excluding arrests from the scope of Title

II . . . is not the law." *Id.* *Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1303–04 (D. Kan. 2005), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

This Court in *Sudac* went on to state that "[t]he Fifth and Sixth Circuits have addressed the issue under similar circumstances to the present case, and both courts have held that reasonable accommodations are not required when the suspect the police are attempting to arrest creates an exigency by threatening officers or civilians." *Id*. at 1305 (citing *Hainze v. Richards,* 207 F.3d 795 (5th Cir.2000); *Thompson v. Williamson County,* 219 F.3d 555 (6th Cir.2000)).  This Court found *Hainze* and *Thompson* persuasive, and held that "[n]either decision suggests that arrests should be excluded categorically from the scope of Title II of the ADA . . . [r]ather, both decisions recognize that officers should not be expected to make reasonable accommodations when faced with exigent circumstances, i.e., while attempting to arrest an individual who poses an immediate threat to officers or nearby citizens." *Id*. at 1306.  The Court held that "Title II of the ADA . . . did not apply while the officers attempted to disarm [the plaintiff] and otherwise secure the scene" and "[a]lternatively, under *Thompson*, the court concludes that any alleged denial of benefits or services occurred because of [plaintiff's] threatening behavior, not the officers' action." *Id*.; *see also McHenry v. City of Ottawa, Kansas*, 2017 WL 4269903, at *13 (D. Kan. 2017) finding *Sudac* persuasive and concluding that it applies the rule that our Circuit, if faced with the question, would adopt, and holding that the ADA applies to arrests unless an exigency exists).  Plaintiff's ADA claim survives screening.  *See McHenry*, 2017 WL 4269903, at n.7 (noting that individual officers cannot incur liability under the ADA because the ADA only applies to public entities and not individuals).

### D. Failure to Train

Plaintiff alleges a failure to train OPD officers on the proper use of force, crisis management, and de-escalation. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Wright v. City of Ponca City*, 2023 WL 5765848, at *7 (10th Cir. Sept. 7, 2023) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also id*. at 691 ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory.")). Instead, "the government as an entity" can only be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id*. (quoting *Monell*, 436 U.S. at 694). To establish municipal liability a plaintiff must demonstrate the existence of a "municipal policy or custom." *Id*. (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)). Then the "plaintiff must demonstrate 'a direct causal link between the policy or custom and the injury alleged.'" *Id*. at n.9 (citing *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Bryson*, 627 F.3d at 788)).

"[T]he Supreme Court has held that in 'limited circumstances,' a failure to train can be the basis for liability under § 1983." *Horocofsky v. City of Lawrence*, 2022 WL 1421554, at *29 (D. Kan. May 5, 2022) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). Only when a municipality's failure to train employees evidences a " 'deliberate indifference' to the rights of inhabitants" can a failure to train be considered "a city 'policy or custom' that is actionable under § 1983." *Id*. (quoting *Canton*, 489 U.S. at 389). To show deliberate indifference, a plaintiff must show that the municipality had "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation," and a conscious or deliberate choice to disregard the harm. *Id*. (citation omitted).

15

"[A] failure-to-train claim may not be maintained . . . without a showing of a constitutional violation by the allegedly un-, under-, or improperly-trained officer." *Valdez v. Macdonald*, 66 F.4th 796, n.14 (10th Cir. April 24, 2023) (citations omitted); *see also Estate of Burgaz v. Bd. of Cty. Comm'rs*, 30 F.4th 1181, 1189 (10th Cir. 2022) ("[T]o be held liable for either a failure-to-train or failure-to-supervise claim, an individual officer (or deputy) must have committed a constitutional violation.") (citations omitted); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) (stating that "failure to train claims, like their basic excessive force claim against the individual officers, requires a predicate showing that the officers did in fact use excessive force"). Plaintiff's failure to train claim survives screening.

### E. Motions

#### 1. Motion to Admit Supplemental Medical Evidence (Doc. 78)

Plaintiff seeks to admit the Brookside Radiology spinal imaging report dated November 10, 2025, as supplemental medical evidence. Plaintiff once again alleges that "Officers failed to disclose to medical staff that Plaintiff had been shot in the spine, and Plaintiff received no diagnostic spinal imaging or treatment at that time." (Doc. 78, at 1.) Plaintniff also seeks permission to supplement the record with additional doctor's notes and imaging once those materials become available. *Id*. at 5. Plaintiff attaches the report (Doc. 78–2) and his affidavit (Doc. 78–3).

The Court will grant Plaintiff's motion to the extent that the Court has considered it as part of Plaintiff's response at Doc. 75.

#### 2. Motion for Sanctions (Doc. 79)

Plaintiff seeks sanctions, the admission of medical evidence, and the award of $150,000 in immediate medical relief. (Doc. 79, at 1.) He claims that his motion is based on "Defendants'

16

suppression of critical medical injury information, specifically their failure to disclose that Plaintiff was shot in the spine by an Olathe police officer on July 4, 2023, resulting in lasting deformities and untreated spinal fractures." *Id*. Plaintiff states that "Defendants did not disclose to hospital staff that Plaintiff had been shot in the spine, causing Plaintiff to receive no spinal imaging, no spinal evaluation, and no treatment." *Id*. at 2. He claims that "Defendants never disclosed these injuries, never produced related records, and never informed treating facilities." *Id*. at 3.

Plaintiff's allegations are not supported by the videos and photographs as set forth above. The Court is only now finding that some of Plaintiff's claims survive screening, and the Defendants have not been served in this case. Plaintiff's request for sanctions and medical relief is not warranted. Plaintiff's motion is denied.

### 3. Notice (Doc. 80)

Plaintiff has also filed a notice "to assist the Court in reviewing and understanding the medical evidence already filed in the record, specifically the Brookside Radiology Report dated November 10, 2025 . . .." (Doc. 80, at 1.) Plaintiff states that the notice is "not a motion and requests no Court action beyond consideration of the descriptive medical explanation provided . . .." *Id*. (stating that it "is submitted solely for clarity while the Court is reviewing the existing evidence"). The notice seeks no relief, and therefore the Court will not be taking any action on the notice.

## IV. Conclusion

The Court finds that Plaintiff's claims based on excessive force, illegal seizure/false imprisonment/malicious prosecution, failure to train, and the ADA survive screening. The Court will direct the Clerk to serve the remaining Defendants. Plaintiff should refrain from filing any additional submissions until the Defendants have been served and filed a responsive pleading.

17

**IT IS THEREFORE ORDERED BY THE COURT** that the Clerk is directed to correct Defendant John Gunthrie's name on the docket to Jonathan Guthrie.

**IT IS FURTHER ORDERED** that Plaintiff's claims based on excessive force, illegal seizure/false imprisonment/malicious prosecution, failure to train, and the ADA survive screening.

**IT IS FURTHER ORDERED** that the Clerk is directed to serve requests for waivers on the following Defendants who are sued in their individual capacities: Mike Butaud, Billy Wyrick, Jonathan Guthrie, Adam Wray, Kyle Clausius, and (fnu) Lazzaro. The Clerk is directed to prepare summonses pursuant to Rule 4(c)(3) of the Federal Rules of Civil Procedure to be served upon Defendants City of Olathe Commissioners, City of Olathe, and Mike Butaud.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Admit Supplemental Medical Evidence (Doc. 78) is **granted** to the extent that the Court has considered it as part of Plaintiff's response at Doc. 75.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sanctions (Doc. 79) is **denied.**

**IT IS SO ORDERED**.

**Dated November 25, 2025, in Kansas City, Kansas.**

> **S/ John W. Lungstrum**
> JOHN W. LUNGSTRUM
> UNITED STATES DISTRICT JUDGE